UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| CORDAY DIXON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 1:21-cv-01089-JMS-DML |
| | ) |
| NDIAYE, | ) |
| FISHER, | ) |
| J. KENEKHAM, | ) |
| JOHN NWANNUNU, | ) |
| | ) |
| Defendants. | ) |

**Order Granting Defendant's Motion for Summary Judgment**

Plaintiff Corday Dixon, an inmate at New Castle Correctional Facility ("NCCF"), filed this civil rights action under 42 U.S.C. § 1983 alleging that defendants Sgt. Ndiaye, Ofc. Fisher, Nurse Kenekham and Dr. John Nwannunu exhibited deliberate indifference to his serious medical needs in violation of the Eighth Amendment. Defendant Dr. Nwannunu seeks summary judgment arguing that the claim against him should be dismissed because Mr. Dixon did not exhaust his available administrative remedies. Mr. Dixon has responded, and Dr. Nwannunu has filed a reply. For the reasons stated below, Dr. Nwannunu's motion for summary judgment is **granted**.

### I.     Summary Judgment Standard

Summary judgment is appropriate when there is no genuine dispute as to any of the material facts, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Pack v. Middlebury Com. Schools*, 990 F.3d 1013, 1017 (7th Cir. 2021). A "genuine dispute" exists when a reasonable factfinder could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that might affect the outcome of the suit. *Id.* When reviewing a motion for summary judgment, the Court views the record and

1

draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Comty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). The Court need only consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it is not required to "scour every inch of the record" for evidence that is potentially relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573-74 (7th Cir. 2017).

## II.     Background

### A. The Complaint

According to his complaint, Mr. Dixon and other inmates housed in the M-unit of NCCF suffered from heat exhaustion on May 27, 2019, because a heat blower was left on through the weekend. Mr. Dixon and the other inmates raised concerns about the extreme heat conditions and reported headaches, dizziness, and chest pain from heat exhaustion. On May 28, 2019, Mr. Dixon's cellmate exited the cell to attend a class. As Ofc. Fisher and Sgt. Ndiaye attempted to secure Mr. Dixon's cell door following his cellmate's exit, Mr. Dixon's heat exhaustion was so severe that he sat down in front of his cell door and asked to be let out for a minute to cool down. Ofc. Fisher denied Mr. Dixon's requests and told him to "suck it up" or go to segregation for refusing a direct order to reenter his cell. When Mr. Dixon stood to return to his cell, he blacked out and fell to the concrete floor, striking his head. After witnessing this incident, Sgt. Ndiaye and Ofc. Fisher did not call a medical emergency. Rather, they mocked Mr. Dixon, picked him up, propped him against the safety gate, and walked out. After other witnesses to the incident complained, Sgt. Ndiaye and Ofc. Fisher returned to Mr. Dixon's cell and took him to see Nurse Kenekham.

Nurse Kenekham checked Mr. Dixon's blood pressure but did not perform any other examination. "At some point after lots of medical request(s),"[1] Mr. Dixon was examined by

---

[1] According to the medical records, it appears that the date that Mr. Dixon was first seen by Dr. Nwannunu was June 11, 2019. Dkt. 39-8.

2

Dr. Nwannunu, who determined that Mr. Dixon had suffered a concussion due to his fall. Dr. Nwannunu did not send Mr. Dixon to an external provider. Rather, Dr. Nwannunu prescribed Mobic to alleviate the swelling in Mr. Dixon's brain, along with extra-strength Excedrin for Mr. Dixon's migraine pain.

Mr. Dixon submitted many requests for medical care between the June 2019 and February 2021, raising issues about his ongoing headaches, dizziness, and blurry vision. Dkt. 1-2 at 1-10. He also sought referrals for a CT scan and different pain medication in his requests as he was still in a substantial amount of pain. *Id.*

### B. Indiana Department of Correction's Grievance Process

The Indiana Department of Correction ("IDOC") has an Offender Grievance Process ("the Grievance Process") that provides offenders an opportunity to attempt to resolve grievances before filing suit in federal court. Dkt. 39-1 at ¶ 6. The Grievance Processes in effect at the time of the incident[2] consisted of the following steps: (1) a formal attempt to resolve a problem or concern following an unsuccessful attempt at an informal resolution; (2) a written appeal to the facility warden or the warden's designee; and (3) a written appeal to the IDOC Grievance Manager. *Id.* at 3.

### C. Mr. Dixon's Use of the Grievance Process

The parties do not dispute that Mr. Dixon submitted one grievance, #107739, which he fully exhausted. Dkt. 39-1 at ¶ 95. In that grievance, submitted on June 5, 2019, Mr. Dixon complained primarily about the heating issue in the cells and the officers' failure to take him for

---

[2] There were three grievance processes in effect during the time relevant to Mr. Dixon's complaint, one from October 1, 2017 through March 31, 2020; one from April 1, 2020 through August 31, 2020; and one from September 1, 2020 until the present. Dkt. 39-1 at ¶¶ 12, 34, 62. All of the processes are consistent with regard to the issues relevant to the instant motion.

3

medical attention immediately upon him passing out. Dkt. 39-6 at 14-15. The only mention of medical care in that grievance was related to the nurse who examined him on May 28th, but allegedly only took his pulse and failed to check his other vitals. *Id.* at 16. Further, his appeal of that grievance does not include any additional complaints about the medical care. *Id.* at 6-7.

On September 3, 2019, Mr. Dixon submitted a second grievance. Dkt. 39-1 at ¶ 96. That grievance was returned as resolved to Mr. Dixon on September 9, 2019 because it related to a request to see medical staff, and he saw medical staff on September 5, 2019. *Id*. Mr. Dixon's September 3rd grievance reads as follows:

> It's now been three weeks since I submitted health care request forms to be seen by the facility medical doctors; I'm having severe headaches and needs [sic] to be seen by a doctor—As of this date 9/3/19 I still haven't been allowed to be seen by the doctor—for medical staff to continue to refuse to allow me to be seen by the doctor is a violation of IDOC medical policy!

Dkt. 39-7 at 3. Under the relief section, Mr. Dixon states that he is seeking "to be seen by facility medical doctor per IDOC policy. How much longer must I continue to suffer?" *Id.*

### III. Discussion

The Prison Litigation Reform Act ("PLRA") provides, "No action shall be brought with respect to prison conditions under section 1983 . . . until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e; *see Porter v. Nussle*, 534 U.S. 516, 524−25 (2002). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Id.* at 532 (citation omitted). The requirement to exhaust provides "that no one

4

is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *Woodford v. Ngo*, 548 U.S. 81, 88–89 (2006) (citation omitted).

Exhaustion of available administrative remedies "means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits)." *Id.* at 90. "To exhaust available remedies, a prisoner must comply strictly with the prison's administrative rules by filing grievances and appeals as the rules dictate." *Reid v. Balota*, 962 F.3d 325, 329 (7th Cir. 2020).

While a prisoner "must exhaust available remedies," he "need not exhaust unavailable ones." *Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016). An administrative procedure is unavailable when 1) the process operates as a "simple dead end," 2) when it is so opaque that it is incapable of use, or 3) when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859–60. Exhaustion is an affirmative defense, and the defendants bear the burden of demonstrating that the plaintiff failed to exhaust all available administrative remedies before he filed this suit. *Thomas v. Reese*, 787 F.3d 845, 847 (7th Cir. 2015).

Dr. Nwannunu argues that Mr. Dixon failed to file any grievances against him that would put Dr. Nwannunu on notice that he failed to properly treat Mr. Dixon's post-concussion syndrome, diagnosed on June 11, 2019, by failing to send him to an outside provider or for use of certain prescribed medications, as alleged in Mr. Dixon's complaint. Dkt. 40 at 12. A grievance is not necessarily inadequate because it fails to name a particular defendant. *See Maddox v. Love*, 655 F.3d 709, 721–22 (7th Cir. 2011). However, it must at a minimum "alert the prison to the nature of the wrong for which redress is sought[.]" *Westefer v. Snyder*, 422 F.3d 570, 580 (7th Cir. 2005); *see also Turley v. Rednour*, 729 F.3d 645, 649 (7th Cir. 2013) (observing that primary purpose of

exhaustion requirement "is to alert the state to the problem and invite corrective action") (internal quotation marks and citation omitted). Put another way, a goal of the exhaustion requirement is to allow prison officials the time and opportunity to respond to complaints internally before an inmate starts litigation. *Smith v. Zachary*, 255 F.3d 446, 450–51 (7th Cir. 2001).

The level of detail necessary in a grievance will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion. *Jones v. Bock*, 549 U.S. 199, 218 (2007). Where the administrative policy is silent, "a grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought." *Strong v. David*, 297 F.3d 646, 650 (7th Cir. 2002); *see also Wilder v. Sutton*, 310 F. App'x. 10, 15, 2009 WL 330531, *4 (7th Cir. 2009) ("prisoners must only put responsible persons on notice about the conditions about which they are complaining"). An offender "need not lay out the facts, articulate legal theories, or demand particular relief" so long as the grievance objects "intelligibly to some asserted shortcoming." *Strong*, 297 F.3d at 650.

Here, Mr. Dixon's September 3rd grievance clearly articulates that he is dissatisfied with the failure to be seen by a facility medical doctor during the prior three weeks. While Mr. Dixon does refer to ongoing pain in the grievance, given the multiple statements that he is seeking to be seen by a facility doctor, it does not appear to the Court that this grievance would be sufficient to put the prison and its doctor on notice that Mr. Dixon was dissatisfied with the failure to send him to a specialist or change his current medication.[3] Mr. Dixon explicitly stated that the relief he was seeking was "to be seen by facility medical doctor per IDOC policy." Dkt. 39-7 at 3.

In his opposition, Mr. Dixon does not argue that his September 2019 grievance exhausted his claim. Instead, he argues that he was not required to submit a grievance specific to

---

[3] Defendant states in his Undisputed Material Facts that submitting a request for health care does not take the place of an offender grievance, dkt. 40 at 10, and Mr. Dixon agrees, dkt. 43 at 3.

Dr. Nwannunu because it was related to the issues that he fully exhausted in his June 2019 grievance regarding the heat in the cells and the failure of the officers and nurse to provide him with medical care the day he passed out. Dkt. 43 at 4. Given the nature of the allegations in the June 5, 2019 grievance, that grievance would not have been sufficient to put the prison on notice about issues with the medical care provided for Mr. Dixon's post-concussion syndrome. While Mr. Dixon is correct that he is not required to continue to grieve each time the same incident repeatedly occurs, *see Turley*, 729 F.3d at 650, there was no indication in the initial June 5th grievance that Mr. Dixon would even have ongoing symptoms beyond that day; let alone that he would be dissatisfied with Dr. Nwannunu's decision (six days after his June 5th grievance) to prescribe him Mobic and decline to send him to a specialist. In short, Mr. Dixon did not adequately put the prison on notice by fully exhausting a grievance regarding his issues about his post-concession syndrome treatment. *See Westefer*, 422 F.3d at 580.

Alternatively, Mr. Dixon argues that any further grievances related to the events of May 28, 2019 would have been futile and would have been "met with machination, and misrepresentations to maintain damage control of the issue." Dkt. 43 at 7. Mr. Dixon believes it would have been futile to file additional grievances because he argues that the response to his initial grievance was "absurd and nothing more than a complete misrepresentation of events that actually took place that day and simply def[ies] all logic and reason." Dkt. 43 at 6. But, the fact that Mr. Dixon's grievance about the events on May 28, 2019 was denied does not excuse Mr. Dixon from attempting to grieve his claim about the subsequent failure to properly treat his post-concussion syndrome in the months thereafter. *See Perez v. Wis. Dept. of Corr.* 182 F.3d 532, 536–37 (7th Cir. 1999) ("No one can know whether administrative requests will be futile; the only way to find out is to try."). Even if Mr. Dixon thought that submitting a grievance about Dr. Nwannunu's

treatment of his post-concussion syndrome would be futile, "he had to give the system a chance." *Flournoy v. Schomig*, 152 F. App'x 535, 538 (7th Cir. 2005); *see also Canady v. Davis*, 376 F. App'x 625, 626 (7th Cir. 2010) ("[a] prisoner must exhaust administrative remedies even if he believes that the process is futile or requests relief that the administrative body does not have power to grant.").

Because Mr. Dixon failed to first exhaust his administrative remedies as to his claims against Dr. Nwannunu, the defendant's motion for partial summary judgment must be granted.

### IV. Appointment of Counsel

Mr. Dixon has also filed a motion for appointment of counsel. Dkt. 47. Litigants in federal civil cases do not have a constitutional or statutory right to court-appointed counsel. *Walker v. Price*, 900 F.3d 933, 938 (7th Cir. 2018). Instead, 28 U.S.C. § 1915(e)(1) gives courts the authority to "request" counsel. *Mallard v. United States Dist. Court*, 490 U.S. 296, 300 (1989). As a practical matter, there are not enough lawyers willing and qualified to accept a pro bono assignment in every pro se case. *See Olson v. Morgan*, 750 F.3d 708, 711 (7th Cir. 2014) ("Whether to recruit an attorney is a difficult decision: Almost everyone would benefit from having a lawyer, but there are too many indigent litigants and too few lawyers willing and able to volunteer for these cases.").

"'When confronted with a request under § 1915(e)(1) for pro bono counsel, the district court is to make the following inquiries: (1) has the indigent plaintiff made a reasonable attempt to obtain counsel or been effectively precluded from doing so; and if so, (2) given the difficulty of the case, does the plaintiff appear competent to litigate it himself?'" *Eagan v. Dempsey*, 987 F.3d 667, 682 (7th Cir. 2021) (quoting *Pruitt v. Mote*, 503 F.3d 647, 654 (7th Cir. 2007)). These two questions "must guide" the Court's determination whether to attempt

to recruit counsel. *Id.* These questions require an individualized assessment of the plaintiff, the claims, and the stage of litigation. *See Pruitt*, 503 F.3d at 655–56.

The first question, whether litigants have made a reasonable attempt to secure private counsel on their own, "is a mandatory, threshold inquiry that must be determined before moving to the second inquiry." *Eagan*, 987 F.3d at 682; *see also Thomas v. Anderson*, 912 F.3d 971, 978 (7th Cir. 2019) (because plaintiff did not show that he tried to obtain counsel on his own or that he was precluded from doing so, the judge's denial of these requests was not an abuse of discretion). The plaintiff has attempted to contact at least ten attorneys with requests for representation without success. *See* dkt. 3-1 at 1-2. The Court finds that he has made a reasonable effort to recruit counsel on his own before seeking the Court's assistance. He should continue his efforts to find counsel.

"The second inquiry requires consideration of both the factual and legal complexity of the plaintiff's claims and the competence of the plaintiff to litigate those claims himself." *Eagan*, 987 F.3d at 682 (citing *Pruitt*, 503 F.3d at 655). "Specifically, courts should consider 'whether the difficulty of the case—factually and legally—exceeds the particular plaintiff's capacity as a layperson to coherently present it to the judge or jury himself.'" *Id.* (quoting *Pruitt*, 503 F.3d at 655). "This assessment of the plaintiff's apparent competence extends beyond the trial stage of proceedings; it must include 'the tasks that normally attend litigation: evidence gathering, preparing and responding to motions and other court filings, and trial.'" *Id.* (quoting *Pruitt*, 503 F.3d at 655).

In his motion, Mr. Dixon states that he that he has a ninth-grade education. Dkt. 47 at 2. He also states that he has a vision impairment that makes it difficult for him to concentrate when he reads. *Id.* Mr. Dixon states that inmates who were previously assisting him have been transferred to other "houses" or facilities. *Id.*

9

While this case is further along than the first time the Court considered and denied Mr. Dixon's request for the appointment of counsel, dkt. 13, at this stage, the nature of the issues (that the officer defendants caused him to suffer in hot temperatures and that the medical defendants refused to treat him) still do not appear to be complex. Based on Mr. Dixon's continued clear and comprehensible filings to date, *see* dkts. 1, 3, 43, 47, his use of the Court's processes, the non-complex nature of the issues, and Mr. Dixon's familiarity with the factual circumstances of his claims, the Court finds that Mr. Dixon is competent to litigate on his own. The Court will not attempt to recruit counsel to represent Mr. Dixon at this time, and thus, his motion, dkt. [47], is **denied without prejudice**.

As the action proceeds, Mr. Dixon may file a renewed motion for assistance recruiting counsel. The Court will also remain alert to additional circumstances, such as a settlement conference or a trial, that may warrant reconsideration of Mr. Dixon's motion.

## V. Conclusion

For the reasons stated above, Dr. Nwannunu's motion for summary judgment, dkt. [39], is **granted**. The claims against Dr. Nwannunu are dismissed without prejudice. *See Ford v. Johnson*, 362 F.3d 395, 401 (7th Cir. 2004) ("*[A]ll* dismissals under § 1997e(a) should be without prejudice.") (emphasis in original). **The clerk is directed to terminate** Dr. John Nwannunu as a defendant in this case. Because the claims against defendants Ndiaye, Fisher and Kenekham remain pending, no final judgment shall issue at this time.

For the reasons stated above, Mr. Dixon's motion for appointment of counsel, dkt. [47], is **denied without prejudice**.

**IT IS SO ORDERED.**

Date: 7/21/2022

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

CORDAY DIXON
243014
New Castle - CF
New Castle Correctional Facility - Inmate Mail/Parcels
1000 Van Nuys Road
New Castle, IN 47362


Marley Genele Hancock
CASSIDAY SCHADE LLP
mhancock@cassiday.com