UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| CORDAY DIXON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 1:21-cv-01089-JMS-KMB |
| | ) |
| NDIAYE Sgt., Annex M-Unit Supervisor, | ) |
| FISHER Officer, Annex M-Unit Staff, | ) |
| J. KENEKHAM Nurse, Annex M-Unit emergency responder, | ) |
| | ) |
| Defendants. | ) |

**ORDER DENYING MOTIONS FOR SUMMARY JUDGMENT
AND DIRECTING FURTHER PROCEEDINGS**

Plaintiff Corday Dixon, an inmate at New Castle Correctional Facility, filed this civil rights action alleging that Defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. Defendants Officers Ndiaye and Fisher have filed a motion for summary judgment, dkt. 88, Defendant Nurse Kenekham has filed a separate motion for summary judgment, dkt. 92, and Dixon has filed a cross-motion for summary judgment, dkt. 96. For the reasons discussed below, all pending motions for summary judgment are **DENIED**.

**I. Standard of Review**

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because

1

those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017) (cleaned up).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

When reviewing cross-motions for summary judgment, all reasonable inferences are drawn in favor of the party against whom the motion at issue was made. *Valenti v. Lawson*, 889 F.3d 427, 429 (7th Cir. 2018) (citing *Tripp v. Scholz*, 872 F.3d 857, 862 (7th Cir. 2017)). The existence of cross-motions for summary judgment does not imply that there are no genuine issues of material fact. *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Eng'rs, Loc. Union 150, AFL-CIO*, 335 F.3d 643, 647 (7th Cir. 2003).

## II. Factual Background

### A. Undisputed Facts

For a few days before May 28, 2019, the HVAC system in the NCCF unit where Dixon was housed was malfunctioning, causing high levels of heat in the unit of up to or above 100 degrees. Dkt. 99, p. 12. On the previous night, the shift commander ordered that all of the food

slots be opened in the offenders' cells to increase air circulation. *Id.* at p. 30. However, when Officer Ndiaye, the shift commander on the morning of the 28th, came on duty, he ordered that all the food slots be closed. Dkt. 93-5, p. 13.

On the morning of the 28th, Dixon's cellmate was let out for an extracurricular activity. Dixon took the opportunity to sit outside his cell because it was cooler there. *Id.* at p. 14. At some point, Defendant Fisher ordered Dixon to return to his cell. *Id.* After initially refusing to do so, Dixon stood up but then immediately blacked out and fell, hitting his head on the concrete floor. *Id.*

Defendants Ndiaye and Fisher did not call a medical emergency after Dixon fell. *Id.* at 15. When Dixon had regained consciousness, they assisted him to the nearest medical station, where Defendant Nurse Kenekham was on duty. *Id.* at 15, 17. Nurse Kenekham did not evaluate Dixon for a head injury, and there is no documented medical record from this visit, but Nurse Kenekham does not deny that she saw Dixon that day. Dkt. 99, pp. 30-31. Dixon did not have any visible signs of injury, such as bleeding or bruising. Dkt. 93-1, p. 3.

In ensuing weeks, Dixon submitted healthcare requests complaining of headaches, blurred vision, and memory loss. Dixon submitted the first request on June 2, 2019. *Id.* at p. 4. On June 11, 2019, Dr. John Nwannunu diagnosed Dixon with post-concussion. *Id.* at p. 6. Dixon thereafter continued to file numerous health care requests, stating that the Mobic he had been prescribed for brain swelling was ineffective; Dr. Nwannunu never referred Dixon for outside treatment or evaluation. *Id.* at pp. 6-15. On June 30, 2019, Dixon saw another nurse after he says he became lightheaded when coming down from his top bunk, causing him to fall and hit his head on the ground again. *Id.* at pp. 7-8. Dixon had many more medical visits in the following months. On

3

February 8, 2021, Dixon filed a healthcare request stating, "I have been having severe headaches due to the incident that occurred on 5-28-19 that have plagued me all this time." Dkt. 90-3.

Dixon filed this suit on April 29, 2021. As screened by the Court, Dixon's complaint alleged:

> Mr. Dixon and the other inmates raised concerns about the extreme heat conditions and reported headaches, dizziness, and chest pain from heat exhaustion. Mr. Dixon and the other inmates also asked Sgt. Ndiaye to have another, higher ranked supervisor visit the M-unit and investigate the matter. Their requests were ignored. Later that day, Mr. Dixon's cellmate exited their cell to attend a class. As Ofc. Fisher and Sgt. Ndiaye attempted to secure Mr. Dixon's cell door following his cellmate's exit, Mr. Dixon's heat exhaustion was so severe that he sat down in front of his cell door and asked to be let out for a minute to cool down. Ofc. Fisher denied Mr. Dixon's requests and told him to "suck it up" or go to segregation for refusing a direct order to reenter his cell. When Mr. Dixon stood to return to his cell, he blacked out and fell to the concrete floor, striking his head. After witnessing this incident, Sgt. Ndiaye and Ofc. Fisher did not call a medical emergency. Rather, they mocked Mr. Dixon, picked him up, propped him against the safety gate, and walked out. After other witnesses to the incident complained, Sgt. Ndiaye and Ofc. Fisher returned to Mr. Dixon's cell and took him to see Nurse Kenekham.
>
> Nurse Kenekham checked Mr. Dixon's blood pressure but did not perform any other examination. Sometime later, after Mr. Dixon submitted multiple medical requests, he was examined by Dr. Nwannunu, who determined that Mr. Dixon had suffered a concussion due to his fall. Dr. Nwannunu did not send Mr. Dixon to an external provider. Rather, Dr. Nwannunu prescribed Mobic to alleviate the swelling in Mr. Dixon's brain and extra-strength Excedrin for Mr. Dixon's migraine pain.

Dkt. 9, pp. 2-3. The Court concluded that Dixon's suit could proceed against Defendants Ndiaye, Fisher, Kenekham, and Dr. Nwannunu as claims that they exhibited deliberate indifference to Dixon's serious medical needs in violation of the Eighth Amendment. *Id.* at 4. The Court later

granted Dr. Nwannunu's motion for summary judgment on the basis that Dixon had failed to exhaust administrative remedies as to him only. Dkt. 50.

The Court further notes that none of the Defendants allege that Dixon did not, in fact, suffer a cognizable injury for purposes of § 1983 as a result of his concussion and lingering aftereffects thereof. They do argue a lack of causation on any of their parts for such injury or injuries. There also is a complete lack of any evidence as to what a delay of 20 minutes in addressing a head injury (as to Officers Ndiaye and Fisher) or days (as to Nurse Kenekham) would mean as far as exacerbating, or not exacerbating, the injury.

### B. Disputed Facts

#### 1. Officers Ndiaye and Fisher

Defendants Ndiaye and Fisher stated in interrogatories that they had no recollection of there being any HVAC or excessive heat problem at NCCF on May 28, 2019. Dkt. 99, pp. 20, 25. Their alleged lack of recollection, however, does not necessarily mean as a matter of law either that (1) there was not in fact an HVAC and excessive heat problem or (2) that they were unaware of such problem. *See Larsen v. Carroll County*, 798 Fed. App'x 942, 944 (7th Cir. 2020) ("a lack of recollection does not, by itself, create a genuine dispute of material fact").

In Dixon's complaint, he alleged that on May 27, the day before he passed out and hit his head, other inmates had passed out due to the extreme heat and inmates complained about the situation. Dkt. 1, p. 6. A nurse came to the block and agreed that the heat was overwhelming, and requested that guards provide ice and fans for the inmates, and open the food ports on their cell doors to allow better air circulation. *Id.* at p. 7. The ports were opened, but no ice or fans were provided. *Id.* And on the morning of the 28th, Defendant Ndiaye ordered the ports to be closed,

over the inmates' objections. *Id.* Defendant Ndiaye ignored inmate requests that he ask a superior officer to be able to take more action to address the extreme heat. *Id.*

Both Defendants Ndiaye and Fisher also asserted in their interrogatories that they do not recall being present when Dixon fell and hit his head. Dkt. 99, pp. 18, 23. But Dixon testified directly in his deposition that Defendant Fisher, at least, "was standing right there" when he passed out, fell, and hit his head. Dkt. 93-5, p. 28. He also testified that Defendant Fisher "didn't give me the time to gather myself. And he knew that the cell was extremely hot and that I had the symptoms of a heat stroke." *Id.* at 29. Just before demanding that Dixon get up, Defendant Fisher told him to "suck it up" and threatened him with segregation if he did not immediately get up and go back into the cell. Dkt. 1, p. 8. He also believed, based on information passed along to him by other inmates (and who submitted sworn declarations to the Court to this effect), both Defendants Ndiaye and Fisher laughed at him, propped him up, and left him there for at least 20 minutes, until other inmates insisted that they take him to the medical station. Dkt. 99, p. 12. In Dixon's words, "[t]hey had to carry me" to the station. Dkt. 93-5, p. 16. When Dixon saw Nurse Kenekham, she insisted that Dixon should be provided with ice and gave Defendants Ndiaye and Fisher a bag to fill with ice, but they did not do so. *Id.* at pp. 16-17.

**2. Nurse Kenekham**

In her sworn declaration, Nurse Kenekham states that no one told her that Dixon had fallen and hit his head before he was brought to her. Dkt. 93-1, p. 3. She also states that the reason she did not conduct any examination of Dixon at that time was because he was being extremely belligerent, so the guards removed him from her office and took him back to his cell. *Id.* at pp. 3-4.

6

In his deposition, Dixon flatly denied being belligerent when he was taken to see Nurse Kenekham. Dkt. 93-5, p. 18. He also testified that he "believe[d]" Defendant Ndiaye told Nurse Kenekham that he had fallen and hit his head. *Id.* at p. 17.

### III. Discussion

Under the Eighth Amendment, "prisoners cannot be confined in inhumane conditions." *Thomas v. Blackard*, 2 F.4th 716, 720 (7th Cir. 2021) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). Prisons must "provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of inmates.'" *Farmer*, 511 U.S. at 832 (quoting *Hudson v. Palmer*, 468 U.S. 517 (1984)).

A conditions-of-confinement claim includes both an objective and subjective component. *Giles v. Godinez*, 914 F.3d 1040, 1051 (7th Cir. 2019). Under the objective component, a prisoner must show that the conditions were objectively serious and created "an excessive risk to his health and safety." *Id.* (cleaned up). Under the subjective component, a prisoner must establish that the defendants had a culpable state of mind — that they "were subjectively aware of these conditions and refused to take steps to correct them, showing deliberate indifference." *Thomas*, 2 F.4th at 720. Proving the subjective component is a "high hurdle" that "requires something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020) (internal quotations omitted). Neither "negligence [n]or even gross negligence is enough[.]" *Lee v. Young*, 533 F.3d 505, 509 (7th Cir. 2008).

The Eighth Amendment's prohibition against cruel and unusual punishment also imposes a duty on the states, through the Fourteenth Amendment, "to provide adequate medical care to incarcerated individuals." *Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002) (citing *Estelle v.*

7

*Gamble*, 429 U.S. 97, 103 (1976)). "Prison officials can be liable for violating the Eighth Amendment when they display deliberate indifference towards an objectively serious medical need." *Thomas*, 2 F.4th at 721–22. "Thus, to prevail on a deliberate indifference claim, a plaintiff must show '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (quoting *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016)).

Deliberate indifference requires more than negligence or even objective recklessness. *Id.* A plaintiff "must provide evidence that an official actually knew of and disregarded a substantial risk of harm." *Id.* "Of course, medical professionals rarely admit that they deliberately opted against the best course of treatment. So in many cases, deliberate indifference must be inferred from the propriety of their actions." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir. 2021) (cleaned up). "[A] jury can infer deliberate indifference when a treatment decision is 'so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment.'" *Id.* (quoting *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006)). But where the evidence shows that a decision was based on medical judgment, a jury may not find deliberate indifference, even if other professionals would have handled the situation differently. *Id.* at 241−42.

### A. Defendants Ndiaye and Fisher

This Court recently held that prison officials may, in certain circumstances, be found to be deliberately indifferent with respect to extreme heat in a prison. *See Phillips v. Reagal*, No. 1:21-CV-01876-JPH-KMB, 2023 WL 5627993 (S.D. Ind. Aug. 31, 2023). Specifically, "[s]ubjecting a prisoner to extreme temperatures may violate the Eighth Amendment." *Id.* at *5 (citing *Dixon v. Godinez*, 114 F.3d 640, 643-44 (7th Cir. 1994)). If persons who are able to take steps to remediate

a known problem with extreme heat fail to adequately do so, they may be found to be deliberately indifferent to prisoners' welfare. *See id.* at *9 (denying summary judgment to prison officials who claimed they adequately addressed extreme heat in cell block through additional fans in the block, regular temperature checks of prisoners, and provision of some additional to ice to prisoners, where there was evidence more could have been done).

Here, there is clear evidence of extreme heat in Dixon's cell block for 2-3 days at least before he passed out. Nurse Kenekham herself stated in her sworn declaration that the heat was unacceptable, and that fans and ice needed to be provided to the prisoners, but neither was done. There was even less done for the prisoners here than in *Phillips*.

The Court observes that in its screening order, it expressly stated that it was allowing claims against Defendants Ndiaye and Fisher to proceed as claims that they "exhibited deliberate indifference to his serious medical needs in violation of the Eighth Amendment." Dkt. 9, p. 4. Especially when read in conjunction with the complaint itself and the facts recited in the screening order, the "serious medical needs" in question are not only the head injury Dixon sustained when he collapsed, but also the heat exhaustion that directly led to his collapse. The heat exhaustion and head injury are all part of a continuum, not entirely separate incidents. Defendants Ndiaye and Fisher have focused in their summary judgment motion on their response to Dixon's having passed out, and not the extreme heat and potential for heat exhaustion that Dixon alleges led to that incident.

There is sufficient evidence of deliberate indifference for Dixon's claims against Defendants Ndiaye and Fisher to proceed. Again, Defendants Ndiaye and Fisher's claimed inability to remember certain details about the incident does not create a genuine issue of material fact. *Larsen*, 798 Fed. App'x at 944. Rather, the evidence most favorable to Dixon is that Defendants

9

Ndiaye and Fisher were aware of the extreme heat conditions in cell block. Defendant Ndiaye negated the one palliative measure that had been in place when he ordered the food ports on the cell doors to be closed and ignored inmate complaints about the heat. Defendant Fisher refused Dixon's request to rest briefly outside his cell in the cooler air and threatened him with segregation if he did not immediately "suck it up" and return to his cell, at which time Dixon did get up and then lost consciousness. After Dixon fell and hit his head on a concrete floor with an audible crack and lost consciousness, Defendants Ndiaye and Fisher laughed and did nothing for at least 20 minutes besides propping him up against the wall. They did not call a medical emergency, and if Nurse Kenekham is to be believed, they did not tell her that Dixon had lost consciousness and hit his head.

  The Court readily concludes that a jury could find that Dixon's heat exhaustion, fall, and loss of consciousness were objectively serious medical conditions, and that Defendants Ndiaye and Fisher were subjectively indifferent to those conditions. And as anyone who has watched a football game in recent years could attest, leaving a player unattended for 20 minutes after being knocked unconscious by a blow to the head, while officials stood around laughing at the injured player, would almost certainly be seen as callous and "deliberately indifferent" to the player's safety and welfare. Also, Defendants Ndiaye and Fisher have not designated any evidence from which the Court could conclude that a delay of approximately 20 minutes in seeking medical attention for Dixon did not result in an exacerbation of his head injury. Defendants Ndiaye and Fisher are not entitled to summary judgment.

  **B. Nurse Kenekham**

  The question with respect to Nurse Kenekham is relatively straightforward. As she herself acknowledges in her summary judgment memorandum, "Perhaps Mr. Dixon could survive

summary judgment if he had evidence that Nurse Kenekham knew that he was suffering from heat exhaustion, or that he had fallen, hit his head, and possibly sustained a concussion, but chose to ignore them anyway, but he has no such evidence, so he cannot fault her for failing to provide treatment to him for injuries she was entirely unaware of." Dkt. 93, p. 40.

In his deposition, however, Dixon said he thought that Officer Ndiaye told Nurse Kenekham that he had fallen and hit his head. Nurse Kenekham characterizes this testimony as not "proof" that Officer Ndiaye made the statement. Dkt. 108, p. 10. She does not adequately explain, however, why this testimony is not "proof." Elsewhere in her summary judgment reply, Nurse Kenekham correctly notes that inadmissible hearsay cannot be relied on at the summary judgment stage. *Id.* at p. 3 (citing *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009)). But she makes no hearsay argument directly with respect to what Dixon believed Officer Ndiaye told her. It also is unclear that what Officer Ndiaye allegedly told Nurse Kenekham would be admitted for the truth of the matter asserted—whether in fact Dixon had fallen and hit his head—as required for the statement to be hearsay under Federal Rule of Evidence 801(c)(2), as opposed to being introduced for the purpose of showing that the statement was made and its effect (or not) on Nurse Kenekham. *See Schindler v. Seiler*, 474 F.3d 1008, 1011 (7th Cir. 2007).

Nurse Kenekham also states in her declaration that her examination of Dixon was cut short (and hence, also, no report of this visit exists) because of his extreme belligerence, which in her expert opinion was inconsistent with Dixon suffering from heat exhaustion. Again, Dixon directly refuted this characterization of his behavior during his deposition. This presents a classic question of fact, with two diametrically-opposed sworn statements in the record, which can only be resolved at trial.

Furthermore, the Court notes evidence in the record suggesting Nurse Kenekham should have examined Dixon more thoroughly, particularly if Dixon's description of his non-belligerent behavior is accepted. Dixon described having to be "carr[ied]" to the nurse's station by Defendants Ndiaye and Fisher. It is unclear whether they were literally carrying Dixon, or were merely helping him walk, but in either case it would seem to be a potential red flag as to the seriousness of Dixon's condition and the need for a thorough examination, either immediately or shortly thereafter (if it was in fact necessary for Dixon to first calm down), especially in conjunction with Nurse Kenekham's admission that the heat in the cell block was unacceptable. In other words, the evidence viewed in a light most favorable to Dixon is that Nurse Kenekham was aware that Dixon had just sustained a head injury, and/or she deliberately ignored evidence suggesting he had, and then declined to conduct an appropriate examination despite that knowledge.

The Court also notes that there is no suggestion from Nurse Kenekham that a person falling and hitting their head and losing consciousness would not constitute an objectively serious medical condition. And, there is no evidence that the delay in treatment for Dixon's concussion as a result of Nurse Kenekham's failure to thoroughly examine him did not exacerbate that condition. Nurse Kenekham is not entitled to summary judgment.

### C. Dixon's Motion for Summary Judgment

Dixon also has moved for summary judgment. The Court cannot grant Dixon's motion. As noted, there is conflicting evidence in the record as to much of what transpired, and who said what when, that could only be resolved at a trial. Furthermore, although Defendants have not presented proof that any delay in obtaining treatment for Dixon's head injury did not result in any injury to him, Dixon likewise has not designated evidence to the contrary, i.e., that it surely did result in such injury as a matter of law. "In order to succeed in a § 1983 suit, a plaintiff must establish not

12

only that a state actor violated his constitutional rights, but also that the violation *caused* the plaintiff injury or damages." *Gabb v. Wexford Health Sources, Inc.*, 945 F.3d 1027, 1033 (7th Cir. 2019).

### IV. Conclusion

The Defendants' motions for summary judgment, dkts. [88] and [92], are **denied**. Dixon's motion for summary judgment, dkt. [96], also is **denied**. This case will be resolved by settlement or trial.

The Court now sua sponte reconsider's Dixon's motion for counsel, dkt. 76, and will attempt to recruit counsel to represent Dixon through final judgment. However, **the clerk is directed** to send Dixon a form motion for assistance with recruiting counsel. Because this form contains the terms of accepting counsel, Dixon must complete the form and return it no later than **May 3, 2024,** if he seeks the Court's assistance. Dixon's failure to timely complete and return the form will be construed as abandonment of his request for counsel. The Magistrate Judge is requested to set the matter for a telephonic status conference once recruited counsel has appeared or if Dixon abandons his request for counsel.

**IT IS SO ORDERED.**

Date: 4/3/2024

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

13

Distribution:

All ECF-registered counsel of record via email

CORDAY DIXON
243014
NEW CASTLE - CF
NEW CASTLE CORRECTIONAL FACILITY - Inmate Mail/Parcels
1000 Van Nuys Road
P.O. Box E
NEW CASTLE, IN 47362

Magistrate Judge Barr's Chambers